## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Allison Kutz,                                    Case No. 22-cv-1623 (NEB/ECW)

Plaintiff,

v.                                                          **ORDER**

NGI Capital, Inc. *doing business as* Apex
IT and Eric Christopher Rapp,

Defendants.

This matter is before the Court on Plaintiff Allison Kutz's ("Plaintiff" or "Kutz")

Motion for Leave to Amend the Complaint to Add Punitive Damages ("Motion to

Amend") (Dkt. 56).  Defendants NGI Capital, Inc., doing business as Apex IT, and Eric

Christopher Rapp (collectively, "Defendants") oppose the Motion.  (Dkt. 64.)  For the

reasons stated below, the Motion is granted in part and denied in part as moot.

## I.      BACKGROUND

### A.      Operative Complaint and Procedural Background

Plaintiff filed the operative Complaint in this case on June 21, 2022.  (Dkt. 1.)

That Complaint alleges in relevant parts as follows:

- Plaintiff initially began working for Defendant NGI Capital, Inc. d/b/a Apex IT
  ("Apex" or "Company") in October 2015 as a Practice Director, and within her first
  year of employment, the sole owner and Chief Executive Officer ("CEO") at Apex,
  Defendant Eric Christopher Rapp ("Rapp"), sexually harassed her.  (*Id.* ¶¶ 3, 13-
  15.)  Rapp expressed "his inappropriate sexual and 'romantic' desire for Plaintiff in
  front of others," including clients, partners, Apex management, and Plaintiff's peers
  at Apex and sexually harassed Plaintiff in the presence of others, including in the
  presence of Scott Newton, the President of Apex ("President Newton"), and her

direct supervisor Bryan Hinz, who was the Executive Vice President at Apex ("Executive VP Hinz"). (*Id.* ¶¶ 13, 18, 22, 27, 32-34.) Rapp's harassment "was so pervasive that, during industry conferences or required in-person Sales Team meetings and industry conferences, other male coworkers were put on 'Rapp Duty' to ensure Plaintiff could get back to her hotel room unmolested." (*Id.* at ¶¶ 28-30.)

- During a Sales Team trip to Breckenridge, Colorado in December 2018 ("December 2018 sales team trip"), "Plaintiff fell asleep on a couch in front of four Apex peers. Rapp proceeded to pick Plaintiff up off the couch to take her to bed. Plaintiff woke up in Rapp's arms, became alarmed, screamed, and demanded to be put down." (*Id.* ¶ 31.)

- Plaintiff "at all times" declined Rapp's advances; Apex did not have any human resources personnel between 2015 and the spring of 2019 so Plaintiff reported her concerns regarding Rapp's behavior to Executive VP Hinz and President Newton "numerous times" via various platforms, to no avail; in response, Executive VP Hinz "told Plaintiff to 'just ignore him'" and both Executive VP Hinz and President Newton "made clear that there was little they could do to help her because Rapp was the CEO and sole owner of" Apex; and although, Plaintiff "made it clear" to Rapp that his "harassment was not welcome," Rapp "ignored and dismissed Plaintiff's request that he act professionally and stop harassing her," leading to her resignation in May 2019. (*Id.* ¶¶ 16-17, 19-25, 30, 35-37.)

- After receiving assurances from Executive VP Hinz that Apex was instituting changes to improve its "problematic work environment," including by hiring a human resource professional and reinforcing to Rapp that he limit communications with Plaintiff to "business matters," Plaintiff agreed to return to her former role at Apex in November 2019. (*Id.* ¶¶ 40-56.)

- Rapp informed Plaintiff that her "return to Apex was contingent on signing a supplemental agreement drafted by his attorney" which "required Plaintiff to acknowledge that Rapp had feelings for her, that he would do his best not to act on those feelings or otherwise pursue Plaintiff" but if "he were to act on his feelings towards her, Plaintiff would agree not to report the issue to Apex's Human Resources or to her supervisor" and should instead "discuss her concerns directly with him" and "not sue Rapp or Apex for sexual harassment." (*Id.* ¶¶ 49-50.) Plaintiff did not sign the supplemental, or any similar, agreement. (*Id.* ¶¶ 51-55.)

- About 6 months after Plaintiff returned to Apex, Rapp again began sexually harassing her and invited her to join him on trips. (*Id.* ¶¶ 57-60.) Plaintiff refused Rapp's advances and reported his behavior to Executive VP Hinz and President

Newton who both "repeatedly told her to ignore Rapp and limit conversations with him when possible." (*Id.* ¶¶ at 60-61.)

- Plaintiff agreed to meet with Rapp "one-on-one for purposes of a performance review" on August 26, 2020 in Chicago, Illinois, almost a year after her return; during his trip to Chicago, Illinois, Plaintiff arranged for her and Rapp to have dinner with clients "to avoid" meeting with Rapp alone. Rapp "insisted that he and Plaintiff get drinks before the client dinner," and Plaintiff "reluctantly agreed" to drinks only if her sister came along. (*Id.* ¶¶ 63-71.)

- After dinner with clients on August 26, 2020, "Rapp insisted he share an Uber with Plaintiff because, as he explained, he was staying at a hotel near her apartment." (*Id.* ¶ 72.) Plaintiff suggested they leave separately, but reluctantly ordered an Uber for the two to share after Rapp insisted and did so to ensure that Rapp was dropped off at his hotel first, however, the "Uber had to drive past Plaintiff's home on the way to Rapp's hotel. When Rapp saw they were driving past Plaintiff's home, Rapp insisted the driver pull over, and informed Plaintiff that he would just get out with her." (*Id.* at ¶¶ 73-74.) Plaintiff was "immediately concerned for her safety" and opposed Rapp's request; Rapp insisted and pleaded with Plaintiff that they have wine at Plaintiff's apartment; Plaintiff refused his advances but Rapp nonetheless got out of the Uber and "went to the front of her home"; Plaintiff was "shocked and worried for her safety" so she stayed in the Uber and asked the driver to drop her off by the alley behind her home, "thinking she could sneak into her home through the back door, without Rapp realizing she had done so"; when Plaintiff exited the Uber, she realized she did not have the key to her back door so she called her neighbor to assist her and explained "the situation" to him; Plaintiff's neighbor gave her the access code to his back door so that Plaintiff could avoid Rapp and informed Plaintiff that he would head her way to "help her" because he could "tell Plaintiff did not feel safe." (*Id.* ¶¶ 75-81.) Rapp however approached Plaintiff in the alley behind her home, "became furious," "screamed at Plaintiff," following which "[s]he tried to get away from Rapp, but he closed in on her, backing her up into a wall," made insulting commentary to Plaintiff, until Plaintiff's neighbor "intervened" and "physically separate[d] Rapp from Plaintiff to get Rapp to stop" ("August 2020 assault"). (*Id.* ¶¶ 82-89.)

- Plaintiff reported the August 2020 assault to Executive VP Hinz, President Newton, and human resources personnel at Apex, who investigated Plaintiff's report and found that the "evidence" supported Plaintiff's "claims and it does appear that the inappropriate behavior and violations of company policy took place." (*Id.* at 90-99.) Human resources personnel informed Plaintiff that Rapp had been made "aware of the relevant law and company policies prohibiting unlawful harassment and retaliation' so that such conduct 'does not repeat itself'" and that "nothing more

could be done because her harasser, Rapp, was the sole owner and CEO of Apex."
(*Id.* ¶¶ 100-01.)

- As a result of Plaintiff's "formal complaint," Rapp apologized to Plaintiff, but did
  not stop harassing her and threatened to terminate her employment. (*Id.* ¶¶ 102,
  106-13.) Rapp continued to inform others of his desires for Plaintiff; Plaintiff
  continued to refuse Rapp's advances and informed Executive VP Hinz and human
  resources personnel at Apex of his continuous harassing behavior, leading to her
  termination in September 2021. (*Id.* ¶¶ 112, 114-38.)

- Plaintiff resides in Chicago, Illinois; Apex is incorporated under the laws of the
  State of Colorado and is headquartered in Cottage Grove, Minnesota; and Rapp
  resides in Littleton, Colorado. (*Id.* ¶¶ 1-3.)

- At all relevant times, Plaintiff was an "employee" of Apex under Title VII of the
  Civil Rights Act, 42 U.S.C. § 2000e(f) ("Title VII") and the Minnesota Human
  Rights Act, Minn. Stat. § 363A.01, *et. seq.* ("MHRA"); "Apex was Plaintiff's
  'employer'" as defined in Title VII and the MHRA; "Rapp is Apex's sole owner
  and CEO and is the alter ego of Apex"; and Rapp is an employer under Title VII
  and the MHRA. (*Id.* ¶¶ 4, 142-43, 152-53, 159-60, 169-70, 179-80, 188-89.)

- This Court has jurisdiction because Apex's principal office is in Minnesota and it
  conducts business in Minnesota; Plaintiff spoke with her supervisor who is located
  in Minnesota almost daily; Plaintiff made multiple reports of harassment to her
  supervisor who resides in Minnesota and "thereby engaged in protected conduct in
  Minnesota"; "Plaintiff has clients that are based in Minnesota whom she
  consistently contacted"; and Apex "requires employees to agree to Minnesota venue
  and choice of law provisions." (*Id.* ¶ 10.)

In the operative Complaint, Plaintiff asserts the following eight Counts against

Defendants: (1) quid pro quo sex discrimination in violation of Title VII; (2) hostile work

environment sex discrimination in violation of Title VII; (3) retaliation in violation of

Title VII; (4) quid pro quo sex discrimination in violation of the MHRA; (5) hostile work

environment sex discrimination in violation of the MHRA; (6) reprisal in violation of the

MHRA; (7) assault under Minnesota common law; and (8) assault under Illinois common

law. (*Id.* ¶¶ 141-209.) Plaintiff asserted entitlement to punitive damages as to her claims

under Title VII and the MHRA in the operative Complaint, and stated her intent to seek leave to amend the Complaint to add claims for punitive damages for her common law Minnesota and Illinois claims.  (*Id.* ¶¶ 150, 157, 166, 176, 186, 196, C, D.)

On July 27, 2022, Defendants filed a partial motion to dismiss the Complaint, seeking, among other things, dismissal of Counts 7 and 8 in their entirety as preempted by the MHRA and the Workers' Compensation Act ("WCA") and because Plaintiff failed to allege a threat of bodily harm under Minnesota and Illinois law.  (Dkt. 11; Dkt. 12 at 6-7, 14-25.)  Defendants also sought dismissal of Counts 1 through 6.  (Dkt. 12 at 6-7, 8-14.)  On March 1, 2023, United States District Judge Nancy E. Brasel denied Defendants' motion to dismiss in its entirety.  (Dkt. 37.)  As to the assault claims, Judge Brasel found that Plaintiff had stated plausible claims for assault, and ordered Defendants to file an answer to the Complaint within 14 days of the order.  (*Id.* at 13-14.)  On March 15, 2023, Defendants filed an Answer to the Complaint.  (Dkt. 41.)

On April 3, 2023, Plaintiff filed the current Motion to Amend, along with supporting materials.  (Dkts. 56, 58-60.)  Defendants filed their Opposition to the Motion on April 10, 2023, arguing that Plaintiff "embellishes the facts and makes arguments based on allegations that are not found anywhere in her complaint" and that "when the facts of the proposed Amended Complaint are considered, rather than the magnified version present in Kutz's memorandum, it is evident that Kutz's proposed amendment is futile under Federal Rule of Civil Procedure 15."  (Dkt. 64 at 1.)  On April 13, 2023, Plaintiff filed a Reply.  (Dkt. 67.)  The Court held a hearing on the Motion to Amend on May 31, 2023 ("May 31 hearing").  (Dkt. 77.)

**B.     Proposed First Amended Complaint**

Plaintiff's Proposed First Amended Complaint ("Proposed FAC") is largely

identical to the operative Complaint.  (*See* Dkt. 59-1 (redline showing proposed

amendments).)  In relevant part, the Proposed FAC seeks to add the following factual

allegations:

- Because Rapp is Apex's owner and CEO, Apex (and Rapp) knew or should have known about the sexual harassment, and because Rapp ignored Plaintiff's refusals, Apex (and Rapp) deliberately acted in conscious intentional disregard of the high degree of probability of injury to Plaintiff's rights, or otherwise acted with indifference to this probability.  (*Id.* ¶ 19.)

- As a result of Plaintiff's complaints to Company leadership, Apex knew or should have known that Rapp was sexually harassing Plaintiff. Because nothing was done to intervene in the harassing conduct, the Company deliberately acted in conscious, intentional disregard of the high degree of probability of injury to Plaintiff's rights, or otherwise acted with indifference to this probability.  (*Id.* ¶ 26.)

- As a result of Plaintiff's complaints to Company leadership and Human Resources, Apex knew or should have known the severity of Rapp's sexual harassment towards Plaintiff. Because nothing was done to intervene in the harassing conduct, the Company deliberately acted in conscious, intentional disregard of the high degree of probability of injury to Plaintiff's rights, or otherwise acted with indifference to this probability.  (*Id.* ¶ 104.)

- Although Defendants' sexual harassment training demonstrates that Defendants knew that sexual harassment was unlawful, Rapp's refusal to attend such training—and the Company's failure to force him to attend training—shows that Defendants knowingly disregarded their understanding, as the sexual harassment did not stop, and nothing was done to punish or otherwise intervene in Rapp's harassing conduct.  (*Id.* ¶ 109.)

The Proposed FAC also seeks to add claims for punitive damages for each Count

and states as to each: "Defendants willfully committed the above-alleged facts with

malice or deliberate disregard and indifference for the rights and safety of Plaintiff.  As a result, Plaintiff is entitled to punitive damages."  (*Id.* ¶¶ 159, 167, 176, 187, 198, 209, 217, 224.)

## II.    LEGAL STANDARD

Rule 15 of the Federal Rules of Civil Procedure, instead of Minn. Stat. §549.191, provides the procedural framework for this Motion to Amend to add punitive damages in this case asserting claims under federal law, Minnesota statutes, and Minnesota and Illinois common law.  *See Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 396-401 (D. Minn. 2020) (analyzing whether Minn. Stat. § 549.191 or Rule 15 applied to motions to amend the complaint to add punitive damages in diversity cases and concluding that Rule 15 provides the applicable standard); *see also Benner v. St. Paul Pub. Sch., I.S.D. #625*, 380 F. Supp. 3d 869, 910 (D. Minn. 2019) ("Section 549.191 is inapplicable to the present action because Benner's (surviving) claims are premised on federal question jurisdiction and on supplemental jurisdiction, not on diversity jurisdiction"); *Dewick v. Maytag Corp.*, 296 F. Supp. 2d 905, 906 n.3 (N.D. Ill. 2003) ("Contrary to what Maytag contends, Dewicks' motion [to amend the complaint to add a claim for punitive damages] is controlled by Rule 15(a), not by the section of the Illinois Code of Civil Procedure that establishes prerequisites for seeking punitive damages (735 ILCS 5/2-604.1).").

Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave [to amend] when justice so requires."  The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court.  *See, e.g.*,

*Niagara of Wisc. Paper Corp. v. Paper Indus. Union-Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986) (citation omitted).  The Eighth Circuit has held that although amendment of a pleading "should be allowed liberally to ensure that a case is decided on its merits . . . there is no absolute right to amend."  *Ferguson v. Cape Girardeau Cty.*, 88 F.3d 647, 650-51 (8th Cir. 1996) (citing *Chesnut v. St. Louis Cty.*, 656 F.2d 343, 349 (8th Cir. 1981); *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989)).

Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Hillesheim v. Myron's Cards and Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) ("A district court's denial of leave to amend a complaint may be justified if the amendment would be futile.") (citation omitted).  "Denial of a motion for leave to amend on the basis of futility means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Accordingly, in reviewing a denial of leave to amend we ask whether the proposed amended complaint states a cause of action under the *Twombly*[1] pleading standard . . . ."  *Zutz v. Nelson*, 601 F.3d 842, 850-51 (8th Cir. 2010) (citation and marks omitted); *see also In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir. 2007) ("[W]hen a court denies leave to amend on

---

[1]     *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

the ground of futility, it means that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion.").

On a motion to dismiss filed pursuant to Rule 12(b)(6), the Court must take the well-pleaded allegations of a claim as true, and construe the pleading, and all reasonable inferences arising therefrom, most favorably to the pleader. *See Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III.   ANALYSIS

Defendants oppose amendment of the Complaint on futility grounds, arguing that the Proposed FAC does not allege facts "that would allow this Court to conclude that either defendant knew of or intentionally disregarded facts creating a high probability of injury to Kutz's rights or safety, and proceeded to act with disregard or indifference for that high probability of injury." (Dkt. 64.) The Court analyzes the proposed amendment below.

### A.   Counts 1 Through 6—MHRA and Title VII claims

As to Kutz's Title VII claims, where a "plaintiff pleads a claim based on federal law, there is no comparable prohibition on including a request for punitive damages in the initial complaint." *Benner v. St. Paul Pub. Sch., I.S.D. #625*, 407 F. Supp. 3d 819,

822 (D. Minn. 2019).  Moreover, the specific punitive damage provision in the MHRA

displaces the requirements of Minn. Stat. § 549.191.  *See* Minn. Stat. § 363A.29, subd. 4;

*see also Minn. Stat.* § 363A.33, subd. 6 ("If the court or jury finds that the respondent has

engaged in an unfair discriminatory practice, it shall issue an order or verdict directing

appropriate relief as provided by section 363A.29, subdivisions 3 to 6.").

As conceded by Defendants at the May 31 hearing, the operative Complaint

sought punitive damages as to the MHRA and Title VII claims, that is, Counts 1 to 6, and

Defendants did not seek dismissal of Plaintiff's request for punitive damages for those

claims.  Accordingly, Plaintiff need not seek leave to amend to add punitive damages

based on Counts 1 through 6, and the Court therefore denies the Motion to Amend as

moot to the extent it seeks to amend the Complaint to add claims for punitive damages as

to those Counts.[2]  *See Andrews v. Fairview Health Servs.*, Civ. No. 21-1449 (ECT/ECW),

2022 WL 542427, at *4 n.4 (D. Minn. Feb. 23, 2022) ("As stated previously, the

Complaint already seeks punitive damages as to Andrews' MHRA reprisal claim and

MHRA sexual orientation discrimination claims. . . .  As such, the Court finds that

punitive damages as to these claims has already been pled in this action and no further

motion to amend is required."); *see also Peterson-Rojas v. Dakota Cty.*, Case No. 21-cv-

---

[2]      Defendants contend that Plaintiff's statement that the Motion to Amend was "brought 'out of an abundance of caution' further justifies denial" because she has not shown "justice so requires" the amendment.  (Dkt. 64 at 2, 9 n.6.)  Plaintiff made this statement to explain why she sought amendment as to all claims, even though she did not need to do so as to her MHRA and Title VII claims.  (*See* Dkt. 58 at 2 n.1.)  She did not suggest that she did not need to seek leave to amend to add punitive damages as to her common law claims, and the Court will not deny leave on Defendants' proposed ground.

738 (DSD/TNL), 2022 WL 336829, at *3, 6 (D. Minn. Feb. 4, 2022) (denying plaintiff's motion for leave to amend the complaint to add punitive damages and stating that plaintiff "need not amend her Complaint to add a punitive damages claim against the County under the MHRA" because "Plaintiff may request punitive damages under this act at trial and state law caps these claims") (citing Minn. Stat. 363A.29, subd. 4(b)); *Hunter v. Ford Motor Co.*, Civ. No. 08-4980 (PJS/JSM), 2010 WL 11537516, at *3 (D. Minn. Jan. 7, 2010) (stating that the plaintiff need not seek to add punitive damages for her federal claims where plaintiff already sought those damages in her initial complaint and stating as to plaintiff's MHRA claims: "In this case, Hunter asserted punitive damages for her claims under the MHRA in her original Complaint as well as her proposed Amended Complaint.  Hunter need not have brought a motion to amend to add a claim for punitive damages under her MHRA claims, considering she already has asserted a claim for punitive damages in her Complaints.  As such, Hunter may proceed with a punitive damages claim for her [MHRA] claims . . . without leave of the Court.") (internal citations omitted).  In any event, the Proposed FAC alleges that Kutz repeatedly complained about Rapp's sexual harassment to President Newton, Executive VP Hinz, and Apex's Human Resources personnel, who told her that nothing could be done because Rapp was the CEO and owner of Apex, and that Kutz repeatedly made it clear that Rapp's conduct was unwelcome and asked him to stop, and he continued his sexual harassment.  This is sufficient for the Court to find that Rapp and Apex knew of or intentionally disregarded facts creating a high probability of injury to Kutz's rights or safety, and proceeded to act with disregard or indifference for that high probability of

injury, rendering Kutz's claims for punitive damages under the MHRA and Title VII not futile.

The Court analyzes below whether Counts 7 and 8 of the Proposed FAC could withstand a Rule 12(b)(6) motion to dismiss as to each Defendant.

## B.      Claim 7—Minnesota Assault Claim Against Apex and Rapp

In the operative Complaint, Plaintiff sought leave to amend the Complaint to seek punitive damages based on her Minnesota assault claim.  (*See* Dkt. 1 ¶¶ 197-203, C.) Plaintiff now seeks to add a claim for punitive damages as to the Minnesota assault claim. She alleges: "Defendants willfully committed the above-alleged facts with malice or deliberate disregard and indifference for the rights and safety of Plaintiff.  As a result, Plaintiff is entitled to punitive damages."  (Dkt. 59-1 ¶ 217.)

The Court applies substantive Minnesota law in determining whether the Proposed FAC states a plausible claim for punitive damages.  *See Shank v. Carleton Coll.*, No. 16-CV-1154 (PJS/HB), 2018 WL 4961472, at *4 (D. Minn. Oct. 15, 2018), *aff'd*, 329 F.R.D. 610 (D. Minn. 2019)  The relevant legal basis for punitive damages under Minnesota law provides:

> (a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.
>
> (b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn. Stat. § 549.20, subd. 1.

Under these criteria, "[a] defendant operates with 'deliberate disregard' by acting with intent or indifference to threaten the rights or safety of others." *Gamma-10 Plastics, Inc. v. Am. President Lines, Ltd.*, 32 F.3d 1244, 1255 (8th Cir. 1994). As such, "the mere existence of negligence or of gross negligence does not rise to the level of willful indifference so as to warrant a claim for punitive damages."[3] *Ulrich v. City of Crosby*, 848 F. Supp. 861, 868 (D. Minn. 1994) (citations omitted); *see also Shank*, 2018 WL 4961472, at *7 (D. Minn. Oct. 15, 2018) (same); *Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1008 (D. Minn. 2003) ("A mere showing of negligence is not sufficient to sustain a claim of punitive damages.") (cleaned up). Moreover, a plaintiff must allege that the defendants were aware of a high probability that their conduct would cause injury to plaintiff. *See In re McNeilus Mfg. Explosion Coordinated Litig.*, No. 17-cv-5237 (PJS/KMM), 2019 WL 2387110, at *4 (D. Minn. June 6, 2019). Put another way, a court looks to whether the allegations in a proposed amended complaint plausibly allege a

---

[3] "Minnesota law defines gross negligence as 'without even scant care but not with such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong.'" *Greer v. Walsh Constr. Co.*, Civ. No. 15-465 (PAM/JSM), 2016 WL 6892109, at *8 (D. Minn. Feb. 23, 2016) (quoting *State v. Chambers*, 589 N.W.2d 466, 478 (Minn. 1999)).

defendant knew of facts, or intentionally disregarded facts, that created a high probability that the defendant's actions would harm the rights or safety of a plaintiff.

Defendants make various arguments in opposition to the Motion to Amend, which the Court addresses below.  (*See* Dkt. 64.)

### 1.      Choice of Law

To begin, while Defendants do not explicitly argue that Minnesota assault law is inapplicable, they contend that Plaintiff failed "to explain how Minnesota's assault law would convey rights to her while she lived in Illinois" (*id.* at 16 n.10) and argued at the May 31 hearing that neither of the Defendants had any reason to know that Plaintiff might have rights under Minnesota law relating to an assault to have deliberately disregarded said rights, as Plaintiff did not live or work in Minnesota and the alleged assault did not happen in Minnesota.  Plaintiff responded that the Proposed FAC specifically alleges that Apex requires its employees to agree to Minnesota venue and choice-of-law provisions, which suffices at this stage of the proceedings, and that Defendants' argument is more suited for summary judgment.

Defendants previously declined to make a choice-of-law argument when seeking dismissal of Plaintiff's assault claim in connection with their partial motion to dismiss. (Dkt. 12 at 22 n.7.)  Instead, they argued that Plaintiff's assault claims were preempted by the MHRA and the WCA and that Plaintiff failed to allege a threat of bodily harm under Minnesota and Illinois law.  (*See* Dkt. 12 at 14-25.)  In ruling on the partial motion to dismiss and finding Plaintiff had adequately pled an underlying assault claim in the operative Complaint, Judge Brasel noted the parties' agreement "that the legal standard

for assault in Illinois and Minnesota are the same" and that the "attorneys focused their attention to the legal standard established under Minnesota law." (Dkt. 37 at 13 n.1.)

Defendants now urge this Court to consider that Plaintiff failed to explain how Minnesota assault law conveyed rights to her. The Court declines to decide which state's law applies, typically a factually intensive determination, in connection with a Motion to Amend that applies the Rule 12(b)(6) standard. *See McLane v. Ethicon Endo-Surgery, Inc.*, No. 3:12-cv-406-J-99MMH-TEM, 2013 WL 12159429, at *3 (M.D. Fla. June 20, 2013) (granting plaintiff's motion to amend the complaint to add punitive damages, noting that the parties' arguments involved a choice-of-law dispute and the weighing of evidence, and refusing to consider the defendants' arguments as the "issues [were] more appropriately addressed at a later stage of this litigation").

And in any event, Plaintiff alleged in the Proposed FAC that: Apex is headquartered in Cottage Grove, Minnesota, conducts business in Minnesota, and has employees nationwide, including in Minnesota (Dkt. 59-1 ¶¶ 2, 9); a "substantial part of the events and omissions giving rise to Plaintiff's claims occurred in" Minnesota as Plaintiff spoke with her supervisor who resided in Minnesota almost daily (*id.* ¶¶ 9-10); Plaintiff made multiple reports of harassment to her supervisor who resided in Minnesota "and thereby engaged in protected conduct in Minnesota" (*id.*); Plaintiff had clients that are based in Minnesota whom she "consistently contacted" (*id.* ¶ 10); and Apex "requires employees to agree to Minnesota venue and choice of law provisions" (*id.*). These allegations were incorporated by reference as to Plaintiff's assault claims. (*Id.* ¶¶ 210, 218.) The Court finds that these allegations are sufficient for purposes of a Rule 12(b)(6)

analysis, including as to alleging that Defendants had reason to know that Plaintiff may have rights under Minnesota law.  *See Evans v. Bus. Dev. Sales, Inc.*, No. 21-cv-01046 (SRN/HB), 2022 WL 670097, at *7 (D. Minn. Mar. 7, 2022) (finding plaintiff sufficiently alleged that the defendants were aware of her right under Minnesota Statutes 144.4196, subd. 2, where the plaintiff made allegations to that effect in the complaint); *see also Riley v. St. Louis Cty. of Mo.*, 153 F.3d 627, 629 (8th Cir. 1998) (stating that when undertaking a futility analysis, courts are to "look only to the facts alleged in the complaint and construe those facts in the light most favorable to the plaintiff.").

The Court turns to the allegations as to each Defendant.

### 2.   Apex

#### a.   The Parties' Arguments

As to Apex, citing *Zuniga Escamilla v. SMS Holdings Corp.*, Civ. No. 09-2120 (ADM/JSM), 2011 WL 13318238, at *9 (D. Minn. July 29, 2011), Defendants argue that Plaintiff's attempt to impute Rapp's conduct to Apex fails; Plaintiff failed to allege facts that show by clear and convincing evidence that Apex acted with deliberate disregard for her rights or safety; Apex had no way of knowing that the August 2020 assault would occur; prior to the August 2020 assault, Plaintiff "never conveyed any concern to Apex regarding being alone with Rapp," nor did she allege facts showing that Apex knew of or intentionally disregarded any fact creating a high probability under Minnesota law that she would be assaulted; and Plaintiff "agreed" to meet with Rapp one-on-one on August 26, 2020.  (Dkt. 64 at 14-17.)  Defendants contend that while Plaintiff "suggests for the first time" in her supporting affidavit to the Motion to Amend that she informed

16

Executive VP Hinz that she did not want to meet with Rapp one-on-one in 2020, she failed to state when in 2020 the alleged conversation occurred, and "any attempt to claim it was prior to the alleged assault is inconsistent with the pleadings" as the Proposed FAC does not include any such allegations but instead includes allegations relating to "communication boundaries and Apex's hiring of a human resources director."  (*Id.* at 14 n.9.)  Defendants argue that the extent of Plaintiff's "reports" regarding Rapp "related to her belief that he was in love with her, not that he wanted to harm her," that Plaintiff and Rapp were "rarely" in the same location as they lived and worked in different states, and that even if Plaintiff "had requested not to be alone with Rapp before August 2020, she does not plead any facts that would suggest that this request put Apex on notice that there was a high probability that she was at risk of being assaulted after a client dinner or during a performance review."  (*Id.* at 16 (citing *J.W. ex rel. B.R.W. v. 287 Intermediate Dist.*, 761 N.W.2d 896, 904 (Minn. Ct. App. 2009).)  According to Defendants, Apex took prompt and remedial measures after Plaintiff reported the August 2020 assault as human resources personnel "immediately" conducted an investigation, assured Plaintiff that "appropriate action had been taken to ensure such conduct would not repeat itself," and Plaintiff was not thereafter required to meet with Rapp one-on-one and did not allege that she thereafter suffered further assault or inappropriate physical contact from Rapp, showing Apex's actions were "indisputably effective."  (*Id.* at 15-17.)  Defendants contend that the fact that Plaintiff voluntarily agreed to meet with Rapp one-on-one after the alleged August 2020 assault underscores that the two of them meeting, in itself, does not carry a high probability of injury.  (*Id.* at 17.)

Plaintiff responds that she pleaded the requisite connection between Rapp and Apex to impose vicarious liability for punitive damages and put forth facts that sufficiently establish that Rapp was authorized to act on Apex's behalf and that he was "employed in a managerial capacity with authority to establish policy and make planning level decisions" for Apex.  (Dkt. 67 at 14-15 (citing Minn. Stat. § 549.20, subd. 2).) Plaintiff also contends that she informed leadership at Apex about Rapp's unwelcome advances, thereby placing Apex on notice prior to the August 2020 assault, and that although she worked and lived in a different state from Rapp, when they were together, "Rapp demonstrated a propensity to act in a way that was not only uncomfortable to Kutz, but frightening" including the December 2018 incident where Rapp picked her up from the couch during a sales team trip.  (*Id.* at 15-16.)  Plaintiff contends that "Rapp was aware that his conduct was harmful" to her and argues that the facts of the *J.W. ex rel. B.R.W.* case cited by Defendants are distinguishable from those of this case.  (*Id.* at 17.) Plaintiff challenges Defendants' assertion that Apex's response to the August 2020 assault was "indisputably effective" and contends that Apex "simultaneously admitted there was nothing to be done to stop Rapp."  (*Id.* at 16-17.)

### b.  Whether Kutz Sufficiently Alleged a Claim for Punitive Damages Against Apex Under Minnesota Law

The Court begins with Defendants' argument that Kutz failed to allege facts showing that Rapp's conduct can be imputed to Apex under Minnesota Statute § 549.20, subd. 2.  Defendants quote the following language from the *Zuniga Escamilla* case: "[w]hen a plaintiff seeks to impose vicarious liability for punitive damages of an

employer for the acts of its [agent], a plaintiff must present evidence under Minnesota Statute 549.20, subd. 2."  (Dkt. 64 at 17.)  However, as stated earlier, in conducting its analysis at this stage of the proceeding, the Court need only look to the allegations contained in the Proposed FAC.  *See Riley*, 153 F.3d at 629 (stating that the Court "look[s] only to the facts alleged in the complaint" in conducting a futility analysis); *see also Mathiason v. Shutterfly, Inc.*, No. 22-cv-1203 (DSD/DJF), 2023 WL 3477612, at *4 (D. Minn. May 16, 2023) ("When conducting a Rule 12(b)(6) analysis on a motion to amend, a court generally is restricted from examining matters outside of the four corners of the proposed amended complaint.").

The Proposed FAC alleges that "Rapp is Apex's sole owner and CEO and is the alter ego of Apex."  (Dkt. 59-1 ¶¶ 151, 162, 170, 180, 191, 201.)  At the May 31 hearing, Defendants argued that Plaintiff failed to allege facts, including for example that Rapp was employed by Apex, that he was acting in his scope of his employment when he allegedly assaulted her, that Apex authorized or ratified his behavior, or that Rapp was unfit and Apex deliberately disregarded his unfitness.  But the Court's "evaluation of a complaint" is "'a context-specific task that requires [it] to draw on its judicial experience and common sense.'"  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679)).  As stated above, Plaintiff alleged in the Proposed FAC that: "Rapp is Apex's sole owner and CEO and is the alter ego of Apex" (Dkt. 59-1 ¶¶ 151, 162, 170, 180, 191, 201); Rapp made sexual advances towards her "openly in front of client partners, Apex management, and [her] peers" (*id.* ¶ 18); Rapp "repeatedly expressed his desire for Plaintiff directly to Plaintiff's peers and client

19

partners" (*id.* ¶¶ 18, 30); between 2015 and spring of 2019, Apex did not have any human resources personnel to whom Plaintiff could report her concerns of Rapp's harassment, and so she reported her concerns to Executive VP Hinz, who was her direct supervisor, as well as to President Newton, "numerous times via telephone, text and the company's instant messaging platform (Skype), and during meetings" (*id.* ¶¶ 20-22); both Executive VP Hinz and President Newton "knew about and had witnessed Rapp sexually harass Plaintiff, and knew, even before her reports, that she was facing harassment" (*id.* ¶ 23); and Executive VP Hinz "told Plaintiff that he would talk to Rapp about her concerns, when Plaintiff reported Rapp's incessant harassment to [him and] told Plaintiff to 'just ignore [Rapp]'" (*id.* ¶ 24). Plaintiff also alleged that in response to her complaints, both Executive VP Hinz and President Newton "made clear that there was little they could do to help her because Rapp was the CEO and sole owner of the Company" (*id.* ¶ 25); as a result of her complaints "to Company leadership, Apex knew or should have known that Rapp was sexually harassing Plaintiff" (*id.* ¶ 26); Apex's leadership did "nothing" "to intervene in the harassing conduct," so "Rapp's harassment did not stop" (*id.* ¶¶ 26-30); "Rapp's harassment was so pervasive that, during industry conferences or required in-person Sales Team meetings and industry conferences, **other male coworkers were put on 'Rapp Duty' to ensure Plaintiff could get back to her hotel room unmolested**" (*id.* ¶ 31) (emphasis added); and in "December 2018, on a required Sales Team trip to Breckenridge, Colorado, Plaintiff fell asleep on a couch in front of four Apex peers" and "Rapp proceeded to pick [her] up off the couch to take her to bed," after which "Plaintiff

woke up in Rapp's arms, became alarmed, screamed, and demanded to be put down" (*id.* ¶ 33).

Further, Plaintiff alleged that after she resigned her employment with Apex in May 2019, "citing Rapp as the reason for leaving," Executive VP Hinz  discussed her returning to Apex and "Plaintiff made clear that she did not want to return to Apex if she had to endure Rapp's harassment" and that in response, Executive VP Hinz "promised Plaintiff that although she would have to work with Rapp directly, she could limit her communication to business matters," that Executive VP Hinz informed Plaintiff that he "would reinforce such limitations with Rapp," and informed her that "after she left Apex, the Company hired a human resource professional" who "was making changes to improve [Apex's] problematic work environment" and "provide a safeguard against any sexual harassment"; that Plaintiff returned to Apex in November 2019 and by May 2020, Rapp resumed his unwanted advances towards her, which she reported to Executive VP Hinz and "occasionally" to President Newton, "both of whom repeatedly told her to ignore Rapp and limit conversations with him when possible"; and that Rapp's harassing behavior persisted, leading to her blocking him on social media.  (*Id.* ¶¶ 39-49, 58-64.) Based on these allegations, it is reasonable to infer that Rapp was employed by Apex, that Apex ratified his sexual harassment, and that Rapp was unfit for his position and Apex (including Rapp himself[4]), President Newton, Executive VP Hinz, and Human

---

[4]     The Proposed FAC alleges that Rapp told Kutz that complaining to him "has the same effect" as complaining to Apex's Human Resources, and "thereby admitted that his own knowledge of sexual harassment is imputed on Apex."  (Dkt. 59-1 ¶¶ 144-45.)

Resources) deliberately disregarded his unfitness.  *See Morton*, 793 F.2d at 187 (stating that the Court must take the well-pleaded allegations of a claim as true, and construe the pleading, and all reasonable inferences arising therefrom, most favorably to the plaintiff).

During the May 31 hearing, Defendants argued: "Throughout the complaint all we see is Plaintiff's allegations that Mr. Rapp was romantically pursuing her, giving her gifts, sending her wine, saying he would leave his wife for her.  There is no suggestion of violence before that point."  Defendants also argued "we're all aware of situations where romantic pursuit turns violent, but in this case in the complaint there's no allegation that there was any propensity toward violence or maliciousness by Mr. Rapp toward Ms. Kutz" and the alleged August 2020 assault should be treated as a "very discrete event."

These arguments are unpersuasive for several reasons.  First, this argument ignores much of the allegations in the Proposed FAC, which describes Rapp's alleged conduct as "romantic pursuit **and sexual demands**," as well as "**sexual advances**."  (Dkt. 59-1 ¶¶ 18, 153, 154, 156, 181, 182, 184 (emphases added).)

Second, the Eighth Circuit has however instructed that a "complaint should be read as a whole, not parsed piece by piece."  *Braden*, 588 F.3d at 595 (citing *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009) ("factual allegations should be 'viewed in their totality'"); *cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) ("The inquiry [under the Private Securities Litigation Reform Act] is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.").  As such, the Court declines Defendants' invitation to view the alleged

August 2020 assault in isolation rather than in the context of all of the allegations in the Proposed FAC.  Rather, the Court considers all of the allegations, including that Kutz made it clear that she wanted Rapp's sexual harassment and "pursuit" to stop for years (*see, e.g.*, Dkt. 59-1 ¶¶ 16, 32, 64) and Apex leadership made it clear they would do nothing to stop Rapp's sexual harassment of Kutz because he was the owner and CEO of the company (*id.* ¶ 25).  The Court also considers the allegations that, after Kutz returned to Apex and before the alleged August 2020 assault, Rapp repeatedly tried to manufacture a situation where he could physically be with Kutz, including inviting her on trips and trying to join Plaintiff's birthday trip to Florida with her family—which she declined and reported to President Newton and Executive VP Hinz—who did nothing to stop Rapp but instead asked Kutz to "ignore Rapp and limit conversations with him when possible."  (*Id.* ¶¶ 62-63).  Moreover, the Court considers the allegation that "Rapp's harassment was so pervasive that, during industry conferences or required in-person Sales Team meetings and industry conferences, other male coworkers were put on 'Rapp Duty' to ensure Plaintiff could get back to her hotel room unmolested" (*id.* ¶ 31), suggesting a level of concern about Kutz's safety if she were to encounter Rapp while alone.  Based on common sense and judicial experience, and taking all reasonable inferences in favor of Kutz, the Court finds that Kutz has plausibly alleged that Rapp's pursuit of Kutz could lead to threats, assault, or physical harm to Kutz if Rapp had the opportunity to engage with Kutz in person.

During the May 31 hearing, Defendants also tried to distance Apex from Rapp with respect to the incident that occurred during the December 2018 sales team trip.  The

Proposed FAC alleges that: "Plaintiff fell asleep on a couch in front of four Apex peers. Rapp proceeded to pick Plaintiff up off the couch to take her to bed.  Plaintiff woke up in Rapp's arms, became alarmed, screamed, and demanded to be put down."  (*Id.* ¶ 33.)

First, Defendants argued that "we don't know why she was screaming" and that Kutz did not allege that Rapp intended to rape her or commit violence to her or that she feared for her safety around him after that.  Given that the Proposed FAC alleges that Plaintiff screamed because she was "alarmed," and that she woke up in the arms of a man who had repeatedly sexually harassed her and refused to stop notwithstanding her objections, the Court can reasonably infer that Plaintiff screamed because she was afraid of Rapp and what he intended to do to her.  *Braden*, 588 F.3d at 594 (the Court's "evaluation of a complaint" is "'a context-specific task that requires [it] to draw on its judicial experience and common sense'").

Second, according to Defendants, Plaintiff never reported that incident to Apex's leadership.  But in the Proposed FAC, Plaintiff alleged "Defendant Apex directly employed Plaintiff, and Defendant Rapp is Apex's sole owner and CEO and is the alter ego of Apex."  (Dkt. 59-1 ¶¶ 151, 162, 170, 180, 191, 201.)  The Proposed FAC alleges that other leadership at Apex said they could do nothing about his conduct because Rapp owned the company and was the CEO, and that Rapp said that reporting directly to him "has the same effect" as reporting to Human Resources (*id.* ¶¶ 25, 144-45).  Plaintiff has plausibly alleged that Apex's leadership knew about the December 2018 incident both because Rapp is part of that leadership and under an alter ego theory.  *See also Thorkelson v. Publ'g House of the Evangelical Lutheran Church in Am.*, Civ. No. 10-

24

1712 (MJD/JSM), 2012 WL 12905832, at *12 (D. Minn. April 23, 2012) (finding the plaintiff's alter ego claim was not futile in light of the factual allegations, "[t]aken together," alleged by plaintiff); *Johnson v. Evangelical Lutheran Church in Am.*, Civ. No. 11-23 (MJD/LIB), 2011 WL 2970962, at *6 (D. Minn. July 22, 2011) (stating that under Minnesota law: "[A] court may pierce the corporate veil to hold a party liable for the acts of a corporate entity if the entity is used for a fraudulent purpose or the party is the alter ego of the entity.  When using the alter ego theory to pierce the corporate veil, courts look to the reality and not form, with how the corporation operated and the individual defendant's relationship to that operation.") (quoting *Equity Tr. Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339 (Minn. Ct. App. 2009)).

Nor is Defendants' reliance on *J.W. ex rel. B.R.W.* persuasive.  In *J.W. ex rel. B.R.W.*, the Minnesota Court of Appeals affirmed denial of the appellant's motion to amend her complaint to add punitive damages against respondent, a bus company, where appellant alleged that her child had been sexually assaulted by another child while riding a school bus that was run by the bus company.  761 N.W.2d at 901, 904.  The appellant argued amendment was proper because one of the respondent's bus aides was reprimanded twice for falling asleep on the bus instead of being terminated immediately; the bus driver and bus aides failed to follow instructions that the abusive child sit alone in the front seat of the bus; and one of the bus aides had impaired vision in one eye.  *Id.* at 904.  In affirming the district court's ruling, the Minnesota appellate court held that the appellant failed to present "evidence to the district court that [respondent] had any specific knowledge about [the abusive child] that would create a high probability of

25

injury to" the child that was abused and that although, the evidence presented by appellant, "may point towards negligence on" respondent's part, it did not point to a "deliberate disregard" by respondent for the safety of the abused child.  *Id.*  First, as stated above, the Court applies Rule 15, not the evidentiary requirements of Minn. Stat. §549.141, in analyzing the Motion to Amend.  *Riley*, 153 F.3d at 629.

Second, and in any event, none of the actions alleged by the appellant in *J.W. ex. rel. B.R.W.* for purposes of punitive damages related to the bus driver, aides, or respondent's specific knowledge of the abusive child's propensity toward sexual harassment or abuse.  In contrast, as explained in detail above, Plaintiff has plausibly alleged Apex's knowledge of Rapp's sexual demands and advances, including the need to have male coworkers on "Rapp duty" to protect her when in the same location as Rapp, and Apex's failure to do anything about it because he was the CEO and owner of Apex. Plaintiff has also plausibly alleged that Rapp is the alter ego of Apex and his knowledge can be imputed to Apex.  Moreover, the Proposed FAC alleges that Executive VP Hinz knew that Kutz's return to Apex was contingent on Apex's "safeguard against any sexual harassment" in the form of Becky Hochhausen, the Human Resources professional hired by Apex.  (Dkt. 59-1 ¶¶ 42-49.)  The Proposed FAC alleges Rapp's continued sexual harassment of Kutz after she returned, including his attempts to manufacture a situation where they were in the same location, her rejection of those attempts, her reporting of those attempts to President Newton and Executive VP Hinz, and that their response was to repeatedly tell "her to ignore Rapp and limit conversations with him when possible." (*Id.* ¶¶ 60-63.)  Even if they did not know about Rapp's unsolicited physical contact with

Kutz during the December 2018 sales team trip, based on these allegations, Apex leadership had reason to know that Rapp had repeatedly sexually harassed Plaintiff and continued to do so—unchecked by Apex leadership because he owned and was the CEO of Apex—and that Rapp's conduct could well escalate to unwanted physical contact or assault if Plaintiff refused his advances in person.  Simply put, Plaintiff has alleged enough facts in the Proposed FAC to survive a Rule 12(b)(6) analysis as to a punitive damages claims against Apex based on the Minnesota assault claim.

Lastly, as to Defendants' contention that Apex took prompt and remedial actions after Plaintiff reported the August 2020 assault to its human resources personnel, those actions are not something the Court can consider at this stage of the proceedings. *Mathiason*, 2023 WL 3477612 at *4 ("When conducting a Rule 12(b)(6) analysis on a motion to amend, a court generally is restricted from examining matters outside of the four corners of the proposed amended complaint.").  Moreover, Plaintiff alleged in the Proposed FAC that after she reported the August 2020 assault to Executive VP Hinz, he told her that "she could meet with Rapp to hear his apology, or she could leave Apex" and that after human resources personnel at Apex completed their investigation of the August 2020 assault, she was informed that "Rapp would not agree with her request to avoid 'one-on-one-in-person situations(s)'" and "nothing more could be done because her harasser, Rapp, was the sole owner and CEO of Apex, and she could not escalate the complaint to anyone."  (Dkt. 59-1 ¶¶ 93, 98-103.)  Based on these allegations, a court could reasonably infer that Apex's actions were not "prompt and remedial."

In sum, based on the allegations in the Proposed FAC, the Court finds that
Plaintiff has sufficiently pled a claim for punitive damages for her assault claim under
Minnesota law as to Apex.[5]

### 3.    Rapp

#### a.    The Parties' Arguments

Regarding punitive damages against Rapp for Plaintiff's assault claim under
Minnesota law, Defendants argue that Plaintiff failed to "plead a single fact to establish
by clear and convincing evidence that, on the night of the assault, Rapp knew of or
intentionally disregarded the high probability of injury" to Plaintiff's "rights or safety,
and proceeded to act with intentional disregard or indifference for that high probability of
injury." (Dkt. 64 at 18.)  Defendants contend that Plaintiff's basis for claiming punitive
damages against Rapp is no more than a formulaic recitation of the punitive damages
standard, and that she failed to allege for example that Rapp repeatedly assaulted her,
"that these events were planned, or that there was a level of culpability warranting a
claim for punitive damages." (*Id.* at 18-19.)  According to Defendants, there "certainly is
no basis to conclude that Rapp had any intent to cause bodily harm to Kutz in light of her
allegations that he was in love with her" and what the allegations show is that Plaintiff
"agreed to meet one-on-one with Rapp in Illinois, and [] the two of them got into an
argument late at night after hours of drinking." (*Id.* at 19.)

---

[5]    In granting Plaintiff's Motion to Amend, the Court expresses no opinion on
whether Plaintiff will be able to ultimately prove alter ego or vicarious liability, or the
"deliberate disregard" standard required for an award of punitive damages.

Plaintiff responds that an amendment is not futile as the Proposed FAC plausibly alleges that she is entitled to punitive damages on her assault claim against Rapp under Minnesota law and that Defendants "skew" the allegations and attempt to rewrite them in a "self-serving" manner.  (Dkt. 67 at 17-18.)  Plaintiff contends that Defendants' argument is inconsistent with Judge Brasel's order denying Defendants' partial motion to dismiss.  (*Id.* at 18.)

### b.    Whether Plaintiff Sufficiently Alleged a Claim for Punitive Damages Against Rapp Under Minnesota Law

The Court finds that Plaintiff has sufficiently pled a claim for punitive damages as to her assault claim under Minnesota law against Rapp.  First, there is no doubt that Judge Brasel found Plaintiff pled an underlying claim for assault in the operative Complaint. (*See* Dkt. 37 at 13-14.)  In the order denying Defendants' partial motion to dismiss, as to Plaintiff's assault claims, Judge Brasel stated:

> The Court finds that Kutz has adequately pled assault. Relying primarily on *Dahlin*,[6] Defendants argue that the law requires a verbal threat of physical violation for a claim for assault to prevail. Minnesota law does not define assault so narrowly. Although "mere words or threats alone do not constitute assault," *Dahlin* does not support Defendants' argument. 288 N.W. at 852. Minnesota law requires only a "display of force . . . such as to cause plaintiff reasonable apprehension of immediate bodily harm." *Id.*
>
> Kutz's complaint meets this standard. It alleges that Rapp cornered Kutz into an alley at night, screamed at her inches from her face, and restricted her ability to flee. These facts sufficiently plead the requisite display of force required to establish a threat of bodily harm and Rapp's present ability to carry out the threat. Defendants' motion to dismiss the assault claims is denied.

---

[6]    *Dahlin v. Fraser*, 288 N.W. 851, 852 (Minn. 1939).

(*Id.* (internal citations omitted).)  The Proposed FAC does not change the allegations as to Plaintiff's underlying assault claim.  As such, the Court finds Defendants' assertions that there "certainly is no basis to conclude that Rapp had any intent to cause bodily harm to [Plaintiff] in light of her allegations that he was in love with her" unavailing.[7]

Moreover, the Proposed FAC goes well beyond alleging that Rapp was "in love with" Plaintiff.  It alleges ongoing sexual harassment of Plaintiff, including in the form of Rapp's unwanted pursuit over several years and one previous instance of unwanted physical contact by Rapp, which resulted in Plaintiff's screaming in alarm.  The Court is not persuaded by Defendants' arguments that Rapp had no reason to believe Plaintiff did not want to be alone with him.  (Dkt. 64 at 18.)  The Proposed FAC specifically alleged that Rapp booked a hotel room "a block from where Plaintiff lived" during his August 2020 trip to Chicago, Illinois; that on the day of the August 2020 assault, Plaintiff "reluctantly agreed" to have drinks with Rapp before a scheduled client dinner "only if" her sister could come along; that after the client dinner on the day of the August 2020 assault, "Rapp insisted he share an Uber with Plaintiff[,]" "Plaintiff suggested they leave separately, but Rapp was adamant the two share a ride," after which "Plaintiff relented, and she ordered the Uber to ensure that Rapp's hotel be the first stop so that Rapp would

---

[7]     Although not directly on point, "the Minnesota Supreme Court has found, for the purposes of an insurance policy's intentional act exclusion, that 'because harm is substantially certain to result, intent to harm is inferred as a matter of law in cases of nonconsensual sexual contact such as rape or sexual assault where mental illness is not at issue.'" *Escamilla v. SMS Holdings Corp.*, Civ. No. 09-2120 (JMR/JSM), 2010 WL 11646593, at *11 n.8 (D. Minn. April 5, 2010) (quoting *B.M.B. v. State Fire and Cas. Co.*, 664 N.W.2d 817, 822 (Minn. 2003)).

not have an opportunity to come to her home"; that the Uber driver drove past Plaintiff's home on the way to Rapp's hotel, leading to Rapp insisting that the "driver pull over, and [he] informed Plaintiff that he would just get out with her"; and that Plaintiff "told Rapp he could not come to her home." (Dkt. 59-1 ¶¶ 65-77.) Plaintiff also alleged in the Proposed FAC that Rapp "demanded" that "the two get out of the [Uber] together and pleaded with Plaintiff to let him into her home" so he could have a glass of wine with her; that although she refused his advances, Rapp got out of the Uber and went to the front of her home; and that she was "shocked and worried for her safety, remained in the [Uber] and asked the driver to go around the corner" so that she could drop off "by the alley behind her home" in order to avoid Rapp and "sneak into her home through the back door without Rapp realizing she had done so." (*Id.* ¶¶ 78-80.) Further, Plaintiff alleged that irrespective of her attempts to avoid Rapp on the night of the August 2020 assault, that "Rapp had gone around her home to look for [her] and found her in the alley" and he "became furious. He screamed at [her]. She tried to get away from [him], but he closed in on her, backing her up into a wall." (*Id.* ¶¶ 81-86.) Based on these allegations, and considering the allegations that Plaintiff refused Rapp's request to go on trips with him, blocked Rapp on social media after he failed to adhere to her "numerous requests" that he not contact her on social media sites, repeatedly declined of his advances prior to the August 2020 assault, and screamed and became alarmed when he picked her up from the couch when she was sleeping, it is reasonable to infer that Rapp knew and intentionally or recklessly disregarded the fact that Plaintiff did not want to be alone with him.

As to Defendants' other arguments, they cite no authority that advance planning of an assault, or repeated assaults, are necessary to show Rapp's deliberate disregard or reckless indifference to Kutz's right to be free from assault. For all of these reasons, the Court concludes that the Proposed FAC plausibly alleges facts from which the inference can be drawn that Rapp knew of or intentionally disregarded facts that Plaintiff did not want to be alone with him or touched by him, and that he deliberately acted in conscious or intentional disregard or with indifference to the high probability of injury to Kutz's rights and safety.

**C.      Claim 8—Illinois Assault Claim Against Defendants Rapp and Apex**

In the operative Complaint, Kutz sought leave to amend the Complaint to seek punitive damages based on her Illinois assault claim. (*See* Dkt. 1 ¶¶ 204-09, C.) Plaintiff now seeks to add a claim for punitive damages as to the Illinois assault claim, alleging: "Defendants willfully committed the above-alleged facts with malice or deliberate disregard and indifference for the rights and safety of Plaintiff. As a result, Plaintiff is entitled to punitive damages." (Dkt. 59-1 ¶ 224.)

The parties disagree as to the applicable Illinois law. For her part, Plaintiff argued that "the analysis under Illinois law for punitive damages is the same as that under Minnesota law" and noted that the Illinois statute relating to amending to add punitive damages, Ill. Rev. Stat. ch. 110, ¶ 2-640.1 (1991), applies to a "far narrower subset of claims involving negligence or product liability." (Dkt. 58 at 5 n.4.) Plaintiff argues that, in any event, federal procedural law governs the Court's analysis as to the Illinois common law assault claim. (*Id.*) Defendants argue that the Illinois statute cited to by

Plaintiff is irrelevant, that the standard for awarding punitive damages in Illinois is different from that for Minnesota, and that under Illinois law, punitive damages are awarded "where a tort was committed with 'fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others." (Dkt. 64 at 19-20.) Defendants criticize Kutz for not specifying if she seeks punitive damages for actual malice, willful and wanton disregard, or gross negligence indicating wanton disregard. (*Id.* at 20.)

In her Reply, Plaintiff contends that Defendants make no conflict of law arguments or arguments as to how the Court's analysis may vary and that if Section 2-640.1 is inapplicable as argued by Defendants, then there is no authority requiring her to move to amend her complaint to assert a claim for punitive damages under Illinois law as she would be entitled to such damages without amendment. (Dkt. 67 at 19-20.) Plaintiff contends that she is not required to choose a basis under which to plead punitive damages. (*Id.* at 20.) At the May 31 hearing, Defendants argued that Section 2-640.1 is inapplicable and because it is the only ground on which Plaintiff seeks amendment, the Motion to Amend is futile as to her Illinois punitive damages claim.

Section 2-604.1 provides:

In all actions on account of bodily injury or physical damage to property, based on **negligence, or product liability** based on any theory or doctrine, where punitive damages are permitted no complaint shall be filed containing a prayer for relief seeking punitive damages. However, a plaintiff may, pursuant to a pretrial motion and after a hearing before the court, amend the complaint to include a prayer for relief seeking punitive damages. The court shall allow the motion to amend the complaint if the plaintiff establishes at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages.

735 ILCS 5/2-604.1 (emphasis added).

Section 2-604.1 does not apply here as that "provision applies only to a negligence or product-liability action, and not to any other type of action, such as an intentional tort." *Fiala v. Bickford Sr. Living Grp., LLC*, 43 N.E. 3d 1234, 1248 (Ill. App. Ct. 2015) (finding "section 2-604.1 is not applicable under the facts alleged in this case and that the trial court erred in striking plaintiff's request for punitive damages" where the "claims do not sound in negligence").  "The Illinois Supreme Court has specifically and unequivocally held that assault" is a "long-recognized tort action."  *Temores v. Cowen*, 289 F. Supp. 2d 996, 1006 (N.D. Ill. 2003) (citations omitted).  Moreover, Section 2-604.1 is procedural law.  *See Worthem v. Gillete Co.*, 774 F. Supp. 514, 517 (N.D. Ill. 1991) (concluding that Section 2-604.1 is procedural and declining to apply it); *see also Probasco v. Ford Motor Co.*, 182 F.Supp.2d 701, 704 (C.D. Ill. 2002) (stating that because Section 2-604.1 "is a state procedural requirement it does not govern federal courts deciding state law claims.") (collecting cases).

Although Plaintiff could have pleaded a claim for punitive damages as to her assault claim under Illinois law in the operative Complaint, she did not.  Rule 15 however permits the Court to consider Plaintiff's request to amend her Complaint to assert a punitive damages claim.  The Court therefore considers below whether an amendment is justified as to this claim against each Defendant.

1.    **Apex**

  a.    **The Parties' Arguments**

As to Plaintiff's punitive damages claim against Apex, Defendants argue that Plaintiff failed to allege facts in the Proposed FAC giving rise to her claim for such damages and that it is not clear what basis under Illinois law on which Plaintiff seeks punitive damages against Apex, that is, "whether it be actual malice, willful and wanton disregard for Kutz's rights, or gross negligence indicating wanton disregard of" her rights.  (Dkt. 64 at 20-21 (footnote omitted).)  Defendants contend that instead, Plaintiff parrots the Minnesota punitive damages standard, failed to satisfy her burden under Illinois punitive damages law as well as under Illinois pleading requirements as she stated conclusory assertions that punitive damages are warranted, and did not plead facts to "establish that Apex acted with actual malice, deliberate violence, or in a grossly negligent manner so as to indicate wanton disregard for" her safety.  (*Id.* at 21.)

Plaintiff responds that there is no requirement for her to choose a basis under which to plead punitive damages and that Defendants cited no authority for the proposition that the basis for pleading punitive damages is mutually exclusive.  (Dkt. 67 at 20.)  According to Plaintiff, the Proposed FAC plausibly alleges that she is entitled to punitive damages on her claims of assault against Apex under Illinois law.  (*Id.*)

  b.    **Whether Plaintiff Sufficiently Alleged a Claim for Punitive Damages Against Apex Under Illinois Law**

Because Plaintiff pleads her assault claim under Illinois common law, "the availability of punitive damages is governed by Illinois law."  *See Alford v. Aaron's*

*Rents, Inc.*, No. 08-cv-0683-MJR, 2011 WL 2194120, at *1 (S. D. Ill. June 3, 2011).  In

Illinois, punitive damages are "awarded when torts are committed with fraud, actual

malice, deliberate violence or oppression, or when the defendant acts willfully, or with

such gross negligence as to indicate a wanton disregard of the rights of others."  *Loitz v.*

*Remington Arms Co., Inc.*, 563 N.E. 2d 397, 415 (Ill. 1990) (quoting *Kelsay v. Motorola,*

*Inc.*, 384 N.E.2d 353 (Ill. 1978) and citing Restatement (second) of Torts § 908(2) (1979)

("Punitive damages may be awarded for conduct that is outrageous, because of the

defendant's evil motive or his reckless indifference to the rights of others.")).  "Illinois

courts will impose punitive damages against a corporate defendant for the acts of an

employee where (1) it authorized, ratified, or approved the act, (2) the employee was

unfit and the corporation recklessly hired him, or (3) the employee was a manager acting

within the scope of employment."  *Torretto v. I.B. Diffusion*, No. 92 C 2758, 1995 WL

767315, at *4 (N.D. Ill. Dec. 26, 1995).

The Court finds that Plaintiff has sufficiently pled a claim for punitive damages

against Apex under Illinois law.  Plaintiff specifically alleges in the Proposed FAC that

"Defendants **willfully** committed the above-alleged facts with **malice** or deliberate

disregard and indifference for the rights and safety of Plaintiff" and incorporated all

factual allegations by reference in her Illinois assault claim.  (Dkt. 59-1 ¶¶ 218, 224

(emphases added).)  As stated above, in Illinois, punitive damages are "awarded when

torts are committed with fraud, actual malice, deliberate violence or oppression, or when

the defendant acts willfully, or with such gross negligence as to indicate a wanton

disregard of the rights of others."  *Loitz*, 563 N.E. 2d at 415.

Defendants state that Plaintiff used the term "malice," and appear to argue that a distinction exists between the terms "malice" and "actual malice."  (Dkt. 65 at 20 n.12.)  But it is not clear at this juncture why a distinction of those terms matter, if at all, and the *Carson v. Allied News* case cited to by Defendants discusses at the summary judgment stage whether "'actual malice' was shown with convincing clarity" in a libel suit.  529 F.2d 206, 208-09 (7th Cir. 1976) (stating that "actual malice" is "quite different from the common law standard of 'malice' generally required under the state tort law to support an award of punitive damages.  Whereas the common law standard focuses on the defendant's attitude toward plaintiff, 'actual malice' concentrates on the defendant's attitude the truth or falsity of the material published.").  And as Defendants have not cited any law supporting their argument that Plaintiff must identify in the Proposed FAC whether she alleges Rapp acted with actual malice, willful and wanton disregard for Kutz's rights, or gross negligence indicating wanton disregard of her rights, the Court declines to impose this requirement at this stage of the proceedings.

Moreover, the Proposed FAC is far from conclusory as to the Illinois assault claim, as it incorporates the factual allegations by reference, including that Rapp is the alter ego of Apex and so Rapp's knowledge was imputed to Apex, that Apex's leadership was aware of and witnessed Rapp sexually harass Plaintiff, and that Plaintiff complained of Rapp's unwanted advances to Apex's leadership on multiple occasions but to no avail.  *See Torretto*, 1995 WL 767315, at *1-4 (finding the plaintiff alleged sufficient facts to assert a claim for punitive damages against defendant (plaintiff's employer) for the intentional torts of assault and battery committed by the president of her employer where

plaintiff alleged that the president was an alter ego of the employer and that the president deliberately and maliciously sexually harassed her "with the complete knowledge" of the employer where the plaintiff reported the president's offensive conduct to her employer's management who all "did nothing to prevent such conduct" and "thereby encouraged and authorized such conduct"; noting plaintiff's allegations under an alter ego theory against her employer was cognizable under Illinois law; and finding that the employer authorized the president's acts); *see also Cline v. Gen. Elec. Cap. Auto Lease, Inc.*, 757 F. Supp. 923, 933-34 (N.D. Ill. 1991) (finding an employer liable for punitive damages where it was alleged that the collections' manager of the employer committed battery against plaintiff which was "willful, malicious and 'outrageous'" because the employer was "aware of [the collections' manager's] behavior and apparently tolerated it because [the collections' manager] was 'at least worth $500,000 each year to'" the employer and stating that courts "award punitive damages in order to punish a defendant for willful or malicious conduct, as well as to deter others from similar behavior" where an Illinois plaintiff shows that "the defendant's behavior was exceptionally 'antisocial' or 'outrageous'"); *Steel Warehouse of Wis., Inc. v. Caterpillar, Inc.*, No. 90 C 20053, 1990 WL 304266, at *2 (N.D. Ill. Nov. 13, 1990) (stating that a complaint was not subject to dismissal even though it did not plead the elements that must be proved to assert an alter ego claim under Illinois law).

Taking the allegations in the Proposed FAC as true and construing it and all reasonable inferences therefrom favorably to Plaintiff, the Court finds that Plaintiff has

sufficiently pled a claim for punitive damages against Apex for her assault claim under Illinois law.

### 2. Rapp

#### a. The Parties' Arguments

As to Rapp, Defendants argue that Plaintiff failed to establish the appropriate legal standard on which she intends to seek punitive damages against Rapp under Illinois law and that "there are absolutely no facts to suggest that Rapp acted with actual malice, deliberate violence, willfully and wantonly disregarded her rights, or did so in a grossly negligent manner." (Dkt. 64 at 21-22.) Plaintiff responds that she has adequately established entitlement to punitive damages against Rapp under Illinois law and that her allegations "demonstrate that Rapp acted willfully, with total disregard for Kutz's rights and safety, particularly where Rapp intentionally threatened bodily harm with an ability to carry out that threat." (Dkt. 67 at 20-21.)

#### b. Whether Plaintiff Sufficiently Alleged a Claim for Punitive Damages Against Rapp Under Illinois Law

Again, Plaintiff alleged in the Proposed FAC that "Defendants willfully committed the above-alleged facts with malice or deliberate disregard and indifference for the rights and safety of Plaintiff." (Dkt. 59-1 ¶ 224.) The Proposed FAC also alleges that prior to the August 2020 assault, Plaintiff objected to Rapp's advances, leadership at Apex witnessed Rapp sexually harass Plaintiff, Plaintiff reported Rapp's unwanted advances to leadership at Apex, Plaintiff declined Rapp's offers to go on trips with him, Plaintiff blocked Rapp on social media, and on the day of the August 2020 assault,

Plaintiff suggested that they take separate Ubers, declined his request to have a glass of

wine at Plaintiff's home, had the Uber driver drop her off at the alley behind her home in

order to avoid Rapp, and Rapp nonetheless approached her at the alley, "became furious,"

"screamed at Plaintiff. She tried to get away from Rapp, but he closed in on her, backing

her up into a wall[,]" made insulting commentary to her, until her neighbor "intervened"

and "physically separate[d] Rapp from Plaintiff to get Rapp to stop." These allegations

are sufficient to allege a claim of punitive damages under Illinois law against Rapp.  *See*

*Alford*, 2011 WL 2194120, at *1 (finding as to the plaintiff's assault and battery claims

that she sufficiently alleged "willful verbal and physical sexual conduct" by the

defendant, warranting submission of the issue of punitive damages to the jury) (citing

*Knierim v. Izzo*, 174 N.E. 2d 157, 165 (Ill. 1961) ("The 'outrageous nature' of the

defendant's alleged conduct was sufficient to allow the jury to make an award of punitive

damages").

* * *

Accordingly, for all of these reasons, the Court finds that Plaintiff has sufficiently

stated claims for punitive damages for her assault claims against Defendants under

Minnesota and Illinois law.[8]  The Court also grants the Motion to Amend to the extent

---

[8]      At the May 31 hearing, Defendants generally argued that amendment of Plaintiff's
Minnesota and Illinois assault claims is unjustified under Rule 15 because, unlike the
MRHA and Title VII claims, there are no caps on punitive damages as to the common
law assault claims, rendering Plaintiff's request for damages essentially limitless if the
Court grants the Motion to Amend.  Defendants cite no authority for the proposition that
an "unlimited" request for punitive damages renders amendment unjustified, and the
Court rejects this argument.

Plaintiff seeks to add factual allegations (*see* Dkt. 59-1 ¶¶ 19, 26, 59, 104, 109, 124, 130, 140, 145, C) in the Proposed FAC.

## IV.     ORDER

For the reasons stated above, and based upon all the files, records, and proceedings herein, **IT IS ORDERED THAT**: Plaintiff's Motion for Leave to Amend the Complaint to Add Punitive Damages (Dkt. 56) is **GRANTED in part and DENIED in part as moot** as set forth in this Order.

DATED: August 15, 2023                    *s/Elizabeth Cowan Wright*
                                          ELIZABETH COWAN WRIGHT
                                          United States Magistrate Judge